UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                Plaintiff,

                                Civil Case No. 13-12801

v.                              Honorable Linda V. Parker

DETROIT COMMUNITY
HEALTH CONNECTION,

                Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This lawsuit arises from the termination of Gloria Bowens' employment at

Defendant Detroit Community Health Connection ("DCHC") in March 2012.  On

June 26, 2013, the Equal Employment Opportunity Commission ("EEOC") initiated

this lawsuit against DCHC, claiming that DCHC failed to accommodate Ms. Bowens'

alleged disability and terminated her because of her alleged disability in violation of

Title I of the Americans with Disabilities Act of 1990, as amended ("ADA"), and

Title I of the Civil Rights Act of 1991.  Presently before the Court is DCHC's motion

for summary judgment pursuant to Federal Rule of Civil Procedure 56, filed August

13, 2014.  (ECF No. 33.)  The EEOC filed a response to the motion on September 8,

2014 (ECF Nos. 34-36); DCHC filed a reply brief on September 10, 2014 (ECF No.

37).  The EEOC moved for leave to file a sur-reply on September 12, 2014, which the

Court granted and deemed the sur-reply filed on September 19, 2014.  (ECF Nos. 40,

47.)  On October 16, 2014, this Court held a hearing with respect to the motion.  For

the reasons that follow, the Court grants DCHC's motion.

## I.      Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).

The central inquiry is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

After adequate time for discovery and upon motion, Rule 56 mandates summary

judgment against a party who fails to establish the existence of an element essential to

that party's case and on which that party bears the burden of proof at trial. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue

of material fact."  *Id*. at 323. Once the movant meets this burden, the "nonmoving

party must come forward with specific facts showing that there is a genuine issue for

trial."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (internal quotation marks and citation omitted). To demonstrate a genuine

issue, the nonmoving party must present sufficient evidence upon which a jury could

2

reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.   Factual Background

DCHC is a Federally Qualified Health Center that provides health care services to uninsured and under-insured individuals at six neighborhood Detroit health centers. DCHC's President and Chief Operating Officer is Wayne Bradley, Sr.; its Chief Financial Officer is Rao Kakarala.  Ms Bowens worked as a senior medical biller for DCHC from December 2008 to March 2012.

Before she began her employment with DCHC, Ms. Bowens underwent a pre-employment physical at Concentra Medical Centers.  (Pl.'s Resp., Ex. C.)  The physician's assistant who examined Ms. Bowens found her "[a]ble to perform essential functions" and with "[n]o medical restrictions."  (*Id*. at 1.)  As reflected in the exam notes, Ms. Bowens reported that she suffers from rheumatoid arthritis ("RA") in her hands and knees, which causes musculoskeletal problems and

decreased function in either hand and in her knees.  (*Id*. at 3; *see also* Ex. D.)

Between December 2008 and March 2012, Ms. Bowens requested time off work on more than sixteen occasions and was granted leave without any adverse employment action being taken against her.  (Def.'s Mot., Ex. A at 34-35, 23.)  When she requested time off work, Ms. Bowens never advised DCHC of the reasons for her request.  (*Id*. at 21, 30-31.)  Ms. Bowens provided "notes" from her doctors indicating a need to be off work, sometimes for a day and other times for several days; however, the notes did not refer to Ms. Bowens' RA, a need for an accommodation for her RA, or any other alleged disability.  (*Id*.; *see also* Ex. B.)  Ms. Bowens was not aware of anyone at DCHC contacting her doctors for more information concerning her need for time off or her doctors contacting DCHC to provide more information.  (*Id*., Ex. A at 41.)  According to Ms. Bowens, these notes were provided to Mr. Kakarala and Portia Mitchell, DCHC Human Resources Manager.  (*Id*. at 26, 27, 32.)

There is no evidence that Mr. Bradley was aware of Ms. Bowens' medical problems.  When asked at her deposition whether she told anyone at DCHC during her employment that she had some sort of disability requiring accommodation, Ms. Bowens testified that she sent an e-mail to Mr. Kakarala and Ms. Mitchell in early February 2012, in which she requested two weeks family leave "because of the arthritis flare-ups it was affecting the nerves in [her] neck for which [she] would have to have two procedures . . .."  (Pl.'s Resp., Ex. B at 44-45.)  Ms. Bowens did not have

4

a copy of the e-mail and DCHC did not locate the e-mail when searching all of Mr. Kakarala's incoming and outgoing e-mails (presumably as part of the discovery process in this litigation).  (*Id*. at 45; Def.'s Reply Br. at n. 5.)  Ms. Bowens testified that on the same date she sent this e-mail, she spoke with Ms. Mitchell and asked "for documents that I could fill out for leave of absence due to the arthritis . . .."  (Pl.'s Resp., Ex. B at 51-52.)

Ms. Bowens testified that she spoke about her medical situation to some DCHC employees.  She indicated that on one occasion in 2009 and on another occasion in 2010, she told Ms. Mitchell that she had "boils" and was taking medication for arthritis.  (Def.'s Mot., Ex. A at 42-44.)  In February 2012, when Ms. Bowens arrived late to a meeting, she allegedly told Mr. Kakarala she was delayed because she had to go back to retrieve medication for her blood pressure and arthritis.  (Pl.'s Resp., Ex. B at 54-55.)  Ms. Bowens also testified that she told Mr. Kakarala during her job interview that she was not able to lift, bend, or sit for long periods of time because she had developed arthritis following a car accident and back injury.  (*Id*. at 202.)

Ms. Tolliver, DCHC's Billing Manager, states in an affidavit that Ms. Bowens never told her that she had RA or any other condition that prevented her from doing her job.  (Def.'s Mot., Ex. M.)  The only complaint Ms. Tolliver claims she ever heard from Ms. Bowens concerning her physical condition was after March 2012.  (*Id*.)  Carla Coleman, who is a medical biller at DCHC and also worked with Ms. Bowens,

5

provides that Ms. Bowens never mentioned that she had RA or any health condition that prevented her from doing her job or required time off, some form of special assistance, or accommodation to do her job.  (*Id*., Ex. L.)  According to Ms. Coleman, "[t]he only offhand comments [she] heard Ms. Bowens say during the 3 years [she] worked with her was that: "my arthritis is acting up today and my hands hurt", and she only said that a few times during that 3 year period."  (*Id*.)  Ms. Coleman further indicates that even when Ms. Bowens conveyed this information, she never said that she could not do her job, needed assistance to do her job, or needed time off work. (*Id*.)  Another billing department employee, Sheritha Rucker, attested to similar information.  (*Id*.)  Le Ann Crump, also a medical biller who worked in Ms. Bowens department, states in an affidavit that Ms. Bowens did inform her that she had RA, "but she never told [Ms. Crump] that her condition prevented her from doing her job, or required her to have time off or that she needed to be given some form of special assistance or accommodation to do her job."  (*Id*.)

DCHC began suffering significant financial problems beginning in 2009, causing Mr. Bradley and Mr. Kakarala to develop and propose an eighteen month cost containment program to DCHC's Finance Committee.  (Def.'s Mot., Ex. D at 38-39; Ex. F at 31-33.)  According to the minutes of the Finance Committee's meeting on August 17, 2011, the Cost Containment Program was to be implemented effective September 15, 2011, and included laying off up to ten full-time employees.  (*Id*., Ex.

G at DCHC_DEF001174.)  Mr. Bradley explained that DCHC had to lay off management level people who, unlike medical assistants, received higher wages and fringe benefits, to reach the savings he and Mr. Kakarala sought to achieve.  (*Id*. Ex. D at 42-43.)

Pursuant to the cost containment program, in November 2011, DCHC laid off three management level employees: Center Directors at two health centers and a Senior Medical Records Technician.  (*Id*., Ex. H.)  Those positions were never reinstated due to DCHC's continuing fiscal problems.  (*Id*., Ex. F at 55.)  In February 2012, Mr. Bradley identified a supervisory position in the medical billing department as a position that could be eliminated under the cost containment program as the department had two supervisory employees (the Manager and the Senior Medical Biller) and only three lower level employees. (*Id*., Ex. D at 73.)  The current Manager, Michelle Tolliver, had been recently hired to replace the outgoing manager, Louise Jean Phillips.  (*Id*. at 89; Pl.'s Resp., Ex. M.) Mr. Bradley indicated during his deposition that Ms. Tolliver was hired because he did not want the manager's responsibilities to fall upon Mr. Kakarala and Mr. Kakarala was not confident that Ms. Bowens "could move into that position."  (Def.'s Mot., Ex. D at 101.)

Mr. Bradley testified that he looked to Mr. Kakarala for a recommendation as to which position should be eliminated in the medical billing department, as Mr. Kakarala supervised that department along with the other departments related to

DCHC's finances.  (*Id*.; Pl.'s Resp. Ex. H at 50-51.)  It appears, however, that Mr. Kakarala never chose or suggested which position should be eliminated and that the decision was Mr. Bradley's, alone.  (*See, e.g.*, Pl.'s Resp., Ex. H at 79:11-22; Def.'s Mot., Ex. D at 109.)

Mr. Bradley testified that he decided to eliminate Ms. Bowens' position some time before 8:00 a.m. on March 19, 2012.  (Def.'s Mot., Ex. D at 80.)  Mr. Bradley had traveled to Washington, D.C. sometime before that date to attend a National Association of Community Health Centers ("NACHC") conference scheduled to begin on March 21.  (Pl.'s Resp., Ex. H at 74-76.)  Mr. Bradley explained that he arrived in D.C. early because a national committee on which he serves always meets on the Thursday before the conference begins.  (*Id*. at 74.) Mr. Bradley indicated that for at least two weeks prior to that date, he had been speaking with Mr. Karakala about the need to eliminate one of the top postings in the billing department, seeking Mr. Kakarala's recommendation about which position to terminate.  (*Id*. at 76-77; Def.'s Reply, Ex. B at 108.)

According to Mr. Bradley, he felt the need to make a decision while in D.C. because there was a Board of Director's meeting when he returned and he wanted to inform the Board that this additional termination had occurred as part of the cost containment efforts.  (Def.'s Mot., Ex. D at 79-80.)  Mr. Bradley testified that when he asked Mr. Kakarala if he had made up his mind about who to terminate, Mr.

Kakarala responded that he "had just hired Michelle [Tolliver]." (*Id*. at 79.) Mr. Bradley stated that he then "said, well then, that's logic that – that Gloria [Bowens] has to go." (*Id*.)

Mr. Bradley called Ms. Mitchell to relay his decision sometime before 8:00 a.m. on March 19, 2012. (*Id*. at 79; Pl.'s Resp., Ex. I at 109-110.) Ms. Mitchell then prepared and signed a letter addressed to Ms. Bowen, dated March 20, 2012, informing her that her position was being eliminated. (Def.'s Mot., Ex. J.) The letter incorrectly stated that the termination was effective May 20, 2012. (*Id*. at 1.) Ms. Mitchell sent a subsequent letter to Ms. Bowens, also dated March 20, 2012, indicating that the initial letter contained an error in the separation date and should have read that the position would be eliminated effective March 20, 2012. (*Id*. at 3.) A certificate of mailing photocopied on this subsequent letter reflects that it was sent on March 21, 2012. (*Id*.) Ms. Mitchell had prepared a separation summary reflecting Ms. Bowens termination which Ms. Mitchell signed and dated March 20, 2012. (*Id*. at 2.) A DCHC "Personnel/Budget Action Form" documenting the termination was electronically entered and signed by Ms. Mitchell on March 23, 2012, and also was signed by Mr. Bradley and Mr. Kakarala. (Pl.'s Resp., Ex. I.)

In the meantime, at 3:51 p.m. on March 19, 2012, Ms. Bowens sent a facsimile to Ms. Tolliver, which included a letter from someone at Henry Ford Hospital & Health Network's Pierson Clinic stating that Ms. Bowens had been examined and

treated at the clinic on that date and the examining physician recommended she not work from that date through April 1, 2012.  (Def.'s Mot., Ex. O.)  The letter does not indicate why Ms. Bowens needed to be off work during that period.  (*Id.*)  Outpatient Procedure Instructions included in the fax indicated that Ms. Bowens was scheduled for a nerve block on March 23, 2012.  (Pl.'s Resp., Ex. E.)  Also attached was an "EMG Request Outpatient" form that identified the reason for the exam as "bilateral arm pain and right arm weakness."  (*Id.*)

Ms. Bowens sent the documentation only to Ms. Tolliver.  (Def.'s Mot., Ex. A at 70.)  Ms. Bowens testified that she did not contact anyone at DCHC to provide further details about her need for leave.  (*Id.*)  Ms. Tolliver does not work at the same location as DCHC's administrative offices, so she placed Ms. Bowens' facsimile in an inter-office mail envelope to be hand-carried to administration (specifically Ms. Mitchell in Human Resources).  (*Id.*, Ex. M ¶ 7; Ex. Q at 31-33.) As the courier generally comes at 9:30 a.m. and 1:00 p.m., and Ms. Bowens' fax was received toward the end of the day, Ms. Tolliver states that the envelope was not delivered to administration until the following day.  (*Id.*, Ex. M.)  Ms. Tolliver also states in her affidavit submitted in support of DCHC's motion that she did not call or talk to Ms. Mitchell, Mr. Kakarala, Mr. Bradley, or anyone else to discuss Ms. Bowens' fax when it arrived.  (*Id.*)  Ms. Mitchell, however, sent an e-mail to Brenda Snell in payroll on March 19, 2012, stating: "We just received notice that Gloria Bowens will be off from

work starting today, 3/19/12; and will not return until 4/1/12.  Please stop her benefits accurals [sic]."  (Pl.'s Resp., Ex. J.)

On March 27, 2012, Ms. Bowens filed a sworn complaint with the Michigan Department of Civil Rights, indicating that she received documentation from DCHC on March 20, 2012, terminating her position.  (Def.'s Mot., Ex. K.)  She testified during her deposition on March 4, 2014, however, that she believe[s] and "think[s]" she received the termination letter on March 22, 2012.  (Pl.'s Resp., Ex. B at 206.) This lawsuit followed.

## III.   Applicable Law and Analysis

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  An employer's decision to discharge an employee on the basis of disability or an employer's failure to provide a reasonable accommodation to a disabled employee can constitute the type of unlawful discrimination barred by the statute.  *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).  Under the ADA, "disability" is defined to include "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"[1] 42 U.S.C. § 12102(1)(A). To conclude that a person is disabled under this provision, a court must find (1) there is a physical impairment,

---

[1]"Disability" also means having "a record of such an impairment" or "being regarded as having such an impairment."  42 U.S.C. § 12102(1)(B), (C).

(2) which affects a major life activity identified by the person, and (3) the impairment substantially limits that life activity. *Bragdon v. Abbot*, 524 U.S. 624, 631 (1998).

The 2008 Amendments to the ADA expanded the definition of "major life activity" to include "the operation of a major bodily function." 42 U.S.C. § 12102(2)(B). According to the regulations, this includes musculoskeletal functions. 29 C.F.R. § 1630.2( i )(1)(ii). "An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id*. While "not every impairment will constitute a disability within the meaning of this section[,]" 29 C.F.R. § 1630.2(j)(1)(ii), courts are to construe the phrase " 'substantially limits' . . . broadly in favor of expansive coverage." *Id*. at § 1630.2(j)(1)(i) (also advising that " '[s]ubstantially limits' is not meant to be a demanding standard").[2]

---

[2]The ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553, was enacted in response to Supreme Court decisions imposing a burden on ADA plaintiffs that Congress did not intend, making clear that "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." 29 C.F.R. § 1630.2(j)(1)(iv). It bears repeating, however, that this does not mean that "every impairment will constitute a disability within the meaning of" the ADA. *Id*. § 1630.2(j)(1)(ii).

12

Absent direct evidence of disability discrimination, a plaintiff can prove her case through the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). The initial burden falls upon the plaintiff to establish a prima facie case of discrimination. *Id*. To make out a prima facie case of discrimination based on an employee's termination, the plaintiff must show that: (1) the employee is disabled; (2) the employee is otherwise qualified for the position, with or without reasonable accommodation; (3) the employee suffered an adverse employment decision; (4) the employer knew or had reason to know of the employee's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (citing *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (advising that courts should use the five prong test set forth in *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), and not the three prong test reflected in subsequent Circuit decisions).

If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802-04. The plaintiff then has the burden to demonstrate that the defendant's explanation is pretextual. *Id*. The plaintiff can do this by showing "either (1) that the proffered reasons had no basis in fact; (2) that the

13

proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).

For purposes of its summary judgment motion, DCHC assumes that the EEOC can establish a prima facie case of discrimination.[3]  DCHC focuses its motion on its contention that Ms. Bowens' employment was terminated as part of its cost containment program that resulted in the termination of three additional management level employees. DCHC presents sufficient evidence to show that Mr. Bradley made the decision to terminate Ms. Bowens before 8:00 a.m. on March 19, 2012, and that he was unaware that she suffered from a disability at that time.  Based on this evidence, the burden shifts to the EEOC to demonstrate that this stated reason was a pretext for disability discrimination.

To demonstrate pretext, the EEOC attempts to show that the termination decision was not made the morning of March 19, before Ms. Bowens faxed her leave request to Ms. Tolliver.  The EEOC also attempts to show that Ms. Bowens' disability was well known among her co-workers.  For the reasons that follow, the EEOC's evidence fails to create a genuine issue of material fact with respect to these issues.

As to when the termination decision was made, the EEOC first offers the

---

[3]DCHC does not concede that Ms. Bowens is disabled, but it does not argue her lack of disability as a basis to grant summary judgment in its favor.

14

March 19, 2012 e-mail from Ms. Mitchell to Ms. Snell reflecting Ms. Bowens' leave from March 19 until April 1, 2012.  While this evidence undermines Ms. Mitchell's claim that she was unaware of Ms. Bowens' leave request on March 19, it does not show that she was aware of the request earlier that morning when Mr. Bradley is claimed to have conveyed the termination decision to her.[4]  The evidence also does not undermine Mr. Bradley's or Ms. Mitchell's testimony that Mr. Bradley phoned Ms. Mitchell earlier that morning concerning his decision.

The EEOC next offers documentary evidence which it claims contradicts Mr. Bradley's and Mr. Kakarala's "testimony about meeting in Washington, D.C. to discuss terminating [Ms.] Bowens before March 19 . . .."  (Pl.'s Resp. Br. at 4, capitalization removed.)  As an initial matter, neither Mr. Bradley nor Mr. Kakarala testified that they met *in D.C.* before March 19 to discuss the termination decision. Rather, their testimony was that they had discussed the decision prior to the conference and Mr. Bradley made the final decision on March 19 while in D.C.  (*See*

---

[4]The EEOC also offers a March 19, 2012 e-mail from Ms. Tolliver which it claims undermines Ms. Tolliver's testimony that she did not communicate Ms. Bowens' leave request to Ms. Mitchell on that date.  (Pl.'s Resp. Br. at 4, citing Ex. L.)  The e-mail, however, was not directed to Ms. Mitchell.  (Pl.'s Resp., Ex. L.) While it was copied to Mr. Kakarala, the time of the e-mail is after Mr. Bradley and Ms. Mitchell testified the termination decision was made.  Moreover, there is no evidence in the record reflecting when Mr. Kakarala may have read the e-mail. Notably, Mr. Kakarala testified that he does not have a smart phone and that, prior to DCHC switching to a gmail-based system, he did not have access to his e-mail away from work.  (Def.'s Mot., Ex. F at 136.)

Def.'s Mot., Ex. H at 76-77; Def.'s Reply, Ex. B at 108.)  In any event, the EEOC's evidence does not contradict any relevant evidence offered by DCHC.

The EEOC first points to portions of Mr. Bradley's testimony to show that he and Mr. Kakarala traveled separately to D.C.  (*Id*., citing Ex. H at 75-76.)  DCHC, however, never claimed that they traveled to D.C. together.  Next, the EEOC offers a "Letter of Confirmation" concerning Mr. Kakarala's trip insurance, which reflects dates of travel of March 21-25, 2012.  (Pl.'s Resp. Br. at 4, citing Ex. K.)  This evidence, however, does not contradict Mr. Kakarala's and Mr. Bradley's sworn testimony that they arrived in D.C. prior to March 21 and spoke before Mr. Bradley made his decision on March 19.  The EEOC contends that the two men were uncertain of the date they met (*id*. at 5, citing Ex. H at 76-77, 109-110); but there in fact is no uncertainty reflected in the testimony.  The EEOC also refers to the fact that the NACHC website reflects that the conference was held from March 21-25, 2012; however, this fact is not disputed and does not contradict evidence reflecting that Mr. Bradley and Mr. Kakarala arrive prior to the start date to attend other meetings.  As Mr. Bradley explained during his deposition, he is a member of several committees that meet the week before the conference begins and so he arrives in D.C. before the actual conference starts.  (*Id*. at 74-75.)

Finally, the EEOC refers to DCHC's internal discharge form, which was signed by Mr. Kakarala and Mr. Bradley only on March 23, 2012.  (Pl.'s Resp. Br. at 5,

citing Ex. G.)  When this document was signed, however, does not prove when the decision to terminate Ms. Bowens was made.  There is no dispute that the letter terminating Ms. Bowens is dated March 20.  In her sworn EEOC Complaint, Ms. Bowens stated that she received the letter on March 20, 2012.  (Def.'s Mot., Ex. K.) Even assuming the termination letter was not sent on March 19 or 20, the EEOC's own evidence reflects that it at least was sent on March 21.[5]  (*See* Pl.'s Resp., Ex. F.) There is no evidence that Mr. Bradley was informed by then of Ms. Bowens' alleged disability.  In any event, it is not evident from the internal discharge form or the other evidence submitted when the form was signed by Mr. Kakarala and Mr. Bradley. (*See* Pl.'s Resp., Ex. I.)  The only handwritten date on the form appears next to Ms. Mitchell's signature and appears to be in her writing.  There is a typed date on the top of the form, but this might only reflect when the form was prepared.

The EEOC also argues that the following evidence suggests Ms. Bowens' termination was not related to the cost containment program: (1) the other three terminated employees were terminated four months earlier; (2) those terminations were discussed with the finance committee, board of directors, and executive

---

[5]The EEOC offers the postal service's time stamp to show that the termination letter was not mailed until March 21, 2012.  (Pl.'s Resp., Ex. F.)  The time stamp, however, is photocopied onto the letter Ms. Mitchell sent to Ms. Bowens to correct the error in the initial termination letter.  (*Id.*)  This does not prove when the initial termination letter was sent.

management before they were made and the termination letters were issued the day of the employee's termination; and (3) the cost containment program sought a savings of $250,000, which had been achieved before Ms. Bowens' termination. As proof, the EEOC also claims that Mr. Bradley asked management to identify employees "that may get laid off", but never sought management's recommendation prior to selecting Ms. Bowens. Lastly, the EEOC asks the Court to wonder why Ms. Tolliver was hired a few months before Ms. Bowens was terminated, if the asserted reason for the termination was the 2:3 manager to employee ratio in the billing department.

The fact that Mr. Bradley did not follow the same steps with respect to Ms. Bowens' termination does not demonstrate pretext. Importantly, the EEOC does not challenge DCHC's claim that there was a cost containment program. Further, there is no evidence that DCHC was seeking only a total reduction of $250,000 in costs as part of the program, as suggested by the EEOC, or the elimination of only three employees. The minutes from the Finance Committee's August 2011 meeting reflects that the goal for the remaining budget period was $589,000, and included (if needed) the elimination of up to ten full-time employees. (Def.'s Mot., Ex. G at DCHC_DEF001172.) The same minutes reflect that the total targeted savings for the *eighteen month* plan was "close to one million dollars." (*Id*.; *see also* Ex. D. at 39.) Mr. Bradley explained in detail during his deposition what led to the termination of the first three employees and the eventual termination of Ms. Bowens. (*Id*., Ex. D at

18

32, 39-43, 58, 63-64, 72.)  Thus while DCHC may have achieved its cost savings goal

for the first six months of the program, the evidence reflects that further costs savings

were targeted.

The minutes from the Finance Committee's meetings and Mr. Bradley's

deposition testimony also reflect that he had free reign to execute the cost

containment program once it was approved by the committee.  (*Id*. at 38-39; *Id*., Ex.

G.)  There is no evidence that Mr. Bradley was required to follow a particular

protocol before executing cost savings measures.  Absent such a requirement, the

EEOC fails to demonstrate pretext based on the fact that Mr. Bradley could have

followed the same procedures when eliminating Ms. Bowens' position that he took

when eliminating the first three employees pursuant to the program.

The EEOC does not establish pretext based on the fact that the decision to hire

Ms. Tolliver as billing department manager was made a few months before Ms.

Bowens was terminated.  Ms. Tolliver was hired to fill an existing position.  (*See*

Def.'s Mot., Ex. F at 89.)  Mr. Bradley explained during his deposition why he chose

to fill the position and why someone other than Ms. Bowens was selected despite the

imbalance of supervisory to non-supervisory employees in the department.  (*Id*., Ex.

D at 101.)

The ability of the EEOC to prove its case is undermined by the fact that it

offers no evidence to suggest that *Mr Bradley* was aware of Ms. Bowens' alleged

disability. *See Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013) ("existing law makes clear that an employee cannot be considered to have been fired 'on the basis of disability' unless the *individual decision-maker* who fired the individual had knowledge of that disability[.]") (emphasis added) (citing *Burns v. City of Columbus Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1181-82 (6th Cir. 1993); *Moloney v. Home Depot U.S.A., Inc.*, No. 11-10924, 2013 WL 460684, at *1 (E.D. Mich. Feb. 7, 2013); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005); *Hedberg v. Ind. Bell. Tel. Co.*, 47 F.3d 928, 932-33 (7th Cir. 1995). There is no evidence that Ms. Bowens ever said anything about her alleged disability to Mr. Bradley directly or that he learned of her disability elsewhere. Further, the Court finds that the information Ms. Bowens allegedly conveyed to other DCHC employees would not have informed them that she was disabled, as that term is defined under the ADA. The same holds true for the information recorded during Ms. Bowens' pre-employment physical.

Ms. Bowens may have told co-workers that she had RA, experienced pain in her hands or back at one time or another, or was taking medication for certain ailments; however, there was never information communicated that she suffered from a medical condition that limited her substantially in a major life activity. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (finding that the

20

employer had no knowledge of the plaintiff's disability merely because employer knew of several of his symptoms); *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems, however, is not the same as knowing that the employee suffers from a disability"). The EEOC argues that "[i]t is irrelevant if DCHC knew the extent to which Bowens's disability affected her." (Pl.'s Resp. Br. at 19, citing *Cannon-Stokes v. Potter*, No. 07 C 6283, 2010 WL 2166806 (N.D. Ill. May 27, 2010).)  Nevertheless, an employer must be aware of symptoms raising an inference of disability and not every complaint of pain or statement relaying the medications an employee is taking necessarily creates such an inference.  *Cf., Sanglap v. LaSalle Bank, FSB*, 345 F.3d 515, 520 (7th Cir. 2003) (concluding that bank employees, who witnessed the plaintiff's seizures, could have inferred from their observations, that the plaintiff had epilepsy or another disabling condition); *see also* 29 C.F.R. § 1630.2(j)(3)(iii) (listing types of impairments that "will, at a minimum, substantially limit the major life activities indicated", for example "[d]eafness substantially limits hearing; blindness substantially limits seeing; . . . partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function").  DCHC's lack of knowledge concerning Ms. Bowens' alleged disability also thwarts the EEOC's ability to prevail on its claim of discrimination based on a failure to provide Ms. Bowens a reasonable accommodation.

21

Pursuant to the ADA, covered entities must provide "reasonable accommodations to the *known* physical . . . limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose undue hardship on the operation of the business of such covered entity." *Id*. at § 12112(b)(5)(A) (emphasis added).  A plaintiff can establish a prima facie case of discrimination for failure to make reasonable accommodation by showing that: (1) she is disabled within the meaning of the Act; (2) she is a "qualified individual with a disability," meaning she is capable of performing all essential functions of her position with or without accommodation; (3) her employer was aware of her disability; (4) an accommodation was needed, i.e., a causal relationship existed between the disability and the request for accommodation; and (5) the employer denied her reasonable accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir.2004).  As set forth above, there is no evidence presented suggesting that DCHC was aware that Plaintiff suffered from a disability, as defined under the ADA.

For the reasons set forth above, the Court finds that even when viewed in a light most favorable to the EEOC, there is no genuine dispute as to any material fact and that DCHC is entitled to a judgment as a matter of law.

Accordingly,

22

**IT IS ORDERED**, that Defendant's motion for summary judgment is **GRANTED**.

 

 

 

 

                                                 S/ Linda V. Parker _____
                                                   LINDA V. PARKER
                                                   U.S. DISTRICT JUDGE

Dated: November 26, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, November 26, 2014, by electronic and/or U.S. First Class mail.

                                                 S/ Richard Loury _____
                                                   Case Manager